UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS SANDUSKY,

       Plaintiff,                                       Case No. 17-11784

v.                                                      Honorable Nancy G. Edmunds

SERGEANT JEFFREY O'KEEFE, *et al.*,

       Defendants.

_____/

**OPINION AND ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT OFFICERS' MOTION FOR SUMMARY JUDGMENT [102] AND GRANTING DEFENDANT DR. ALBERS' MOTION FOR SUMMARY JUDGMENT [104]**

This case arises from the death of Hal Sandusky ("Sandusky"), who was a detainee at the Detroit Police Department's ("DPD") Second Precinct jail when he died on June 28, 2013. The personal representative of Sandusky's estate, Plaintiff Thomas Sandusky (Sandusky's son), filed two federal lawsuits that were later consolidated by this Court. Since being consolidated, the parties have stipulated to dismissing a number of defendants. The defendants who currently remain are ten DPD police officers, Defendants Jeffrey O'Keefe, Brian Ross, Kevin Zarosly, William O'Brien, Yasmin Cooper (Robinson), Shunta Small, Colette Burks-Weathers, David Dittberner, Eric Ewing, and William Trzos ("Defendant Officers"),[1] as well as the emergency room physician who treated Sandusky prior to his detention, Dr. Sarah Albers. Plaintiff brings deliberate indifference claims against all Defendants, gross negligence claims against

---

[1] Sergeant David Newkirk also remains a defendant in this case. Upon Plaintiff's request, a Clerk's entry of default was entered against him on April 30, 2018. Counsel for Defendant Officers has informed the Court that he is deceased, and that he is not being represented by the City of Detroit. He is not a party to the motions before the Court.

1

Defendant Officers, and supervisory liability claims against Defendant Officers O'Keefe and Trzos. The matter is now before the Court on two motions for summary judgment filed by the defendants—the first filed by Defendant Officers (Dkt. 102) and the second filed by Defendant Dr. Albers (Dkt. 104).[2] Plaintiff filed a response to both motions, (dkts. 107, 109), and Defendants filed reply briefs, (dkts. 112, 113.)  For the reasons stated below, the Court DENIES Defendant Officers' motion with regard to Defendant Officers Burks-Weathers, Ewing, Cooper (Robinson), Small, and O'Brien and GRANTS it with regard to Defendant Officers O'Keefe, Ross, Zarosly, Dittberner, and Trzos.  The Court also GRANTS Defendant Dr. Albers' motion.

## I. Background

Hal Sandusky was thirty-five years old when he was arrested on June 25, 2013, following a domestic altercation.  Hal Sandusky cut his arm and head on a broken window during the altercation.  Defendant Officers Ross and Zarosly were dispatched to the location when one of the witnesses called 911.  (Dkt. 102-1.)  They observed lacerations and blood on Sandusky's arm and head and took him to the Detroit Receiving Hospital ("DRH") for treatment.

Plaintiff was treated in the emergency room by Defendant Dr. Albers, who observed two lacerations to the anterior surface of Sandusky's right elbow.  (Dkt. 104-2, PgID 1697.)  It is undisputed that Dr. Albers examined Sandusky, obtained an x-ray, irrigated and cleaned Sandusky's wounds, sutured the lacerations on his arm, and

---

[2] There were two additional police officers, Defendants Gregory McWhorter and Donald Morgan, who were a part of this case at the time the motion for summary judgment was filed but have since been dismissed by stipulation of the parties.

2

dressed the wounds. (*See id.* at PgID 1698-99.) There is a dispute, however, over the order of these events.

Dr. Albers testified that after she examined Sandusky and before she sutured his wounds, she obtained a x-ray to rule out the presence of a foreign body in the wounds. (Dkt. 104-11, PgID 1855.) She then reviewed the x-ray, which showed no fracture or dislocation but a "tiny hyperdensity" in the deep area of one of the lacerations, which she indicated could be a tiny foreign body. (*Id.* at PgID 1856.) She thoroughly irrigated each laceration with saline and probed the wounds in an attempt to locate and remove the possible foreign body, but she did not see any foreign body. (*Id.* at PgID 1858.) She then placed five sutures over each laceration and washed and dressed the wounds. (*Id.*; *see also* dkt. 104-2, PgID 1699.)

Plaintiff, however, points to Dr. Albers' report, which appears to indicate that she reviewed the x-ray *after* suturing and dressing the wounds. (*See* dkt. 104-2, PgID 1698-99.) Plaintiff's emergency medicine expert opines that under the applicable standard of care, Dr. Albers should have removed the foreign body after imaging revealed its presence, ordered and prescribed antibiotics, and arranged for follow-up evaluation of the patient the following day. (*See* dkt. 107-5.) Dr. Albers testified that she does not prescribe antibiotics unless she thinks the benefits of the medication outweigh the risks, such as when there is an animal bite or a very dirty wound. (Dkt. 104-11, PgID 1849, 1863.) Ultimately, Dr. Albers discharged Sandusky back into the custody of DPD after providing the following instructions both verbally and in writing: follow-up for removal of sutures; return to the ER if not getting better or feeling worse; wash and dry the wound with warm water and soap after twenty-four hours; and call a physician if there is

3

redness, pain, swelling, pus, or if the stitches come out, or if there are any new or bothersome symptoms. (*Id.* at PgID 1862-63; *see also* dkt. 104-2, PgID 1700.)

Officers Ross and Zarosly transported Sandusky to the DPD second precinct jail that evening. They escorted Sandusky into the processing area. They were responsible for handing over his paperwork, including Dr. Albers' discharge instructions to Defendant Officers O'Keefe and Dittberner, although there is a dispute as to whether they did so. Sergeant O'Keefe was the on-duty cellblock supervisor and Officer Dittberner was the intake prison detention officer. Officer Dittberner completed the detainee intake form. (*See* dkt. 109-7.) On the form, he indicated that Sandusky was in need of medical attention, but he did not complete a separate medical care referral form.[3] Sandusky was booked and admitted to the cellblock at approximately 9:30 pm. He remained there over the next 48 hours.

There is evidence Sandusky's health deteriorated during his time at the prison. And on the night of June 27, 2013, at approximately 10:30 pm, Sergeant Newkirk was informed that Sandusky was in need of medical attention by inmate McKinney, who heard Sandusky gagging, vomiting, and choking. (Dkt. 109-9, PgID 2200.) Newkirk replied, "he's okay, he's going through withdrawals," and walked away. At around 11:00 pm, McKinney once again called for help. Five minutes later, several officers responded, including Officers Newkirk, O'Brien, and Small, and found Sandusky unresponsive in his cell. DPD officers administered CPR. EMS eventually arrived and transported Sandusky to Sinai-Grace Hospital where his arm was observed to show

---

[3] DPD was not set up to provide any medical care on site. Thus, if an inmate's discharge instructions mandated that a wound be washed or a bandage changed, the inmate would be transferred to the hospital.

4

infection with sloughing of the skin and mottling. (Dkt. 102-6.) A blood culture was positive for streptococcus bacteria. His platelet count was within normal limits. Sandusky was pronounced dead on June 28, 2013 at 12:56 a.m.

On June 29, 2013, Dr. Gupta, an Assistant Wayne County Medical Examiner, performed an autopsy and concluded that Sandusky died of septic shock due to infection of his lacerations. (Dkt. 102-7.) Plaintiff's expert, Dr. Landers, agrees with this conclusion, and has opined that Sandusky was symptomatic and visibly ill during the 24 hours prior to the time he was found unresponsive in his cell. (Dkt. 109-22.) Those symptoms would have included vomiting, gagging, wound draining and bleeding, sweating, shortness of breath, diarrhea, and confusion. (*Id.* at PgID 2366-67.) Defendant Officers' expert, Dr. Chiodo, on the other hand, has opined that Sandusky died of cardiac arrest caused by an enlarged heart and defective left ventricle. (Dkt. 102-8.) Defendant Officers also state that Oakland County Medical Examiner, Dr. Dragovic, agrees that Sandusky did not die of sepsis and will opine that Sandusky died of cardiac arrest due to a fast-acting flesh-eating bacteria, Neocrotizing Fascitis.[4]

The Defendant Officers who remain in this case are the officers who were responsible for transferring Sandusky to and booking him in the prison, Officers Ross, Zarosly, and Dittberner, along with the following officers who were responsible for monitoring Sandusky and the other detainees in his cellblock during the time periods set forth below:

<u>June 26, 2013</u>
Sergeant O'Keefe4 pm – 12 am
Officer Cooper (Robinson)7 pm – 7 am

---

[4] Defendant Officers have not provided a report or affidavit from Dr. Dragovic.

5

| | |
|---|---|
| <u>June 27, 2013</u> | |
| Lieutenant Trzos | 12 am – 8 am |
| | |
| Sergeant Newkirk | 8 am – 4 pm |
| Officer Burks-Weathers | 7 am – 7 pm |
| Officer Ewing | 7 am – 7 pm |
| | |
| Sergeant Newkirk | 4 pm – 12 am |
| Officer Cooper (Robinson) | 7 pm – 7 am |
| Officer Small | 7 pm – 7 am |
| Officer O'Brien | 7 pm – 7 am |

All officers were responsible for making sure the detainees were safe. (Dkt. 109-26, PgID 2420.) Prison detention officers were responsible for conducting a visual inspection of all the cells every thirty minutes and the supervising officer was responsible for doing so every two hours. (Dkt. 109-29, PgID 2466-67.)

## II.     Legal Standard

It is well established that summary judgment under Federal Rule of Civil Procedure 56 is proper when "'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). When reviewing the record, "'the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.'" *Id.* at 327 (quoting *Tysinger v. Police Dep't of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)). Furthermore, the "'substantive law will identify which facts are material,' and 'summary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 327 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering the material facts on the record, a court

must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## III. Analysis

### A. Defendant Officers

#### 1. Section 1983 Claims

Defendants Officers argue that they are entitled to qualified immunity on Plaintiff's § 1983 claims. Plaintiff responds that there are genuine issues of material facts that preclude summary judgment.

Government officials are entitled to qualified immunity where their actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Green v. Reeves*, 80 F.3d 1101, 1104 (6th Cir. 1996) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A government official will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that the action at issue was lawful; but if the officer of reasonable competence could disagree on this issue, immunity should be recognized. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity is an initial threshold question the court is required to rule on early in the proceeding so that the costs and expenses of trial are avoided where the defense is dispositive. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.*

7

The first inquiry to determine qualified immunity is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the official's conduct violated a constitutional right. *Siegert v. Giley*, 500 U.S. 226, 232 (1991). If no constitutional right would have been violated, there is no necessity for further inquiries concerning qualified immunity. *Saucier*, 533 U.S. at 201. If a violation could be made out, the next step is to determine whether the right was clearly established in light of the specific context of the case, not as a broad general proposition. *Id.* The "clearly established" right allegedly violated by the officials cannot be considered at an abstract level, but must be approached at a level of specificity: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). "Reasonableness" is a question of law to be decided by the trial court.

Pretrial detainees have a right under the Fourteenth Amendment's due process clause to adequate medical treatment similar to the right of prisoners under the Eighth Amendment. *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001). To sustain a cause of action for failure to provide medical treatment, plaintiff must establish that the defendants acted with "deliberate indifference to serious medical needs." *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994). This analysis has two components. "The objective component requires the existence of a 'sufficiently serious' medical need." *Id.* The subjective component requires "facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, and that [s]he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837). "The subjective component

8

must be addressed for each officer individually." *See Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005).

While the parties' medical experts differ on what exactly led to Sandusky's death, it is undisputed that Sandusky had a serious medical need, satisfying the objective component of the analysis. Defendant Officers argue, however, that they were not subjectively aware of facts from which to infer a substantial risk to Sandusky. They argue that Plaintiff is attempting to shift the blame from the only officer who was notified that Sandusky needed medical attention—Defendant Newkirk[5]—to the remaining defendants in this case. As a general matter, Plaintiff argues that all Defendant Officers were aware Sandusky had a serious medical need that required his transfer to the hospital because 1) Dr. Albers' discharge instructions required, in relevant part, monitoring Sandusky's wound, sending him to the ER if his symptoms worsened, and washing his wound with warm soapy water and wrapping it with a new dressing after twenty-four hours, and 2) the evidence shows that Sandusky was exhibiting symptoms serious enough even a layperson would know he required medical attention.

With regard to Plaintiff's argument that it may be inferred that Defendant Officers were aware of, and thus deliberately indifferent to, Sandusky's serious medical needs due to Dr. Albers' discharge instructions, the Court notes that an officer knowing Sandusky had a laceration and needed to return to the hospital for a new bandage does not equate to knowing that Sandusky needed to be taken to the hospital immediately due to his infected arm. And while Plaintiff cites to the case of *Boretti v. Wiscomb*, 930 F.2d 1150, 1154-55 (6th Cir. 1991), for the proposition that the failure to carry out a

---

[5] As noted above, Defendant Newkirk is in default.

physician's discharge instructions may constitute deliberate indifference, in that case, a prison nurse refused to treat the plaintiff's wound for five days or to provide dressings or pain medication despite several direct requests and after a sick call slip was sent to the infirmary.  Here, there is no evidence Sandusky requested any treatment for his lacerations and was then denied that treatment.  Thus, Dr. Albers' discharge instructions are an insufficient basis from which to infer that a particular officer had the required culpable state of mind.  *See Pond v. Haas*, 674 F. App'x 466, 471 (6th Cir. 2016) (dismissing a deliberate indifference claim against the prison official who was responsible for the delay in scheduling a surgery for the plaintiff's broken arm because there was no evidence he was aware of the severity of the injury) (unpublished).

With regard to Plaintiff's second argument, however, a genuine issue of material fact as to deliberate indifference can be based on a strong showing that a medical need is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *See Est. of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005); *see also Shumate v. Cleveland*, 483 F. App'x 112, 114 (6th Cir. 2012) (finding that plaintiff's deliberate indifference claim survived summary judgment, in part, because there were "physical symptoms of distress") (unpublished); *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897-900 (6th Cir. 2004) (finding the evidence sufficient to support an inference that the officers had a culpable state of mind when the plaintiff had "obvious manifestations of pain and injury," including complaints and vomiting).

Here, Plaintiff's expert has opined that Sandusky was symptomatic and visibly ill during the 24-hour period prior to the time he was found unresponsive in his cell.  (*See* dkt. 109-22.)  This is consistent with his opinion that Sandusky's infected arm led to fatal

septic shock. Defendant Officers dispute this and aver that, according to their expert, the cause of death was a fast-acting flesh-eating bacteria, and thus the symptoms may not have materialized until two hours prior to Sandusky's death. The credibility of competing expert witnesses is a matter for the jury, however, and cannot be decided on summary judgment. Moreover, there is eyewitness testimony that supports Plaintiff's expert testimony. Defendant Officers dispute that there is such testimony. For example, Defendant Officers assert that the inmate in the cellblock near Sandusky, McKinney, did not notice Sandusky gagging, vomiting, and choking until June 27 at 10:30 p.m. However, the Court has reviewed the audio recording of McKinney's statement and does not agree with this characterization of his testimony. While the officers questioning McKinney initially inquired about what he saw at 10:30 pm, the officers later asked about how Sandusky looked when he was first placed in the cell. (*See* dkt. 109-10.) McKinney indicated that Sandusky was vomiting each hour, which woke him up because he was a light sleeper. It is not clear what timeframe McKinney was referring to, but it may be inferred from the context of his statements that it was prior to 10:30 pm. Also, McKinney testified that all along the officers were asking Sandusky how he was doing and he had been responding that he was okay. McKinney indicated that Sandusky's voice was getting lower and sounded weaker as the time went on. McKinney's testimony is further supported by the testimony of Officer O'Brien, who stated that when he arrived for his shift on the evening of June 27 at 7 pm, he was informed by his supervisor, Sergeant Newkirk, that Sandusky may be taken to the hospital. (Dkt. 109-19, PgID 2293.) He further testified that Sandusky did not look well. (*Id.*) Thus, considering all of the evidence in the record and drawing all reasonable

inferences in favor of Plaintiff, the Court finds that there is sufficient evidence demonstrating that Sandusky was exhibiting symptoms so obvious even a layperson would know he required immediate medical attention on the day he was found unresponsive in his cell.[6] The Court will now address whether each individual officer "personally interacted" with Sandusky during this time period "so as to have knowledge of [his] medical needs." *See Pond*, 674 F. App'x at 471.

Officers Ross and Zarosly responded to the scene of the incident after Sandusky's domestic altercation. They conveyed Sandusky to the DRH for treatment and then took him to the prison. Officer Dittberner was the intake officer who processed Sandusky when he arrived at the prison and filled out the detainee intake form. These officers had no further contact with Sandusky. Plaintiff argues, however, that there is evidence that Officers Ross and Zarosly may not have conveyed the discharge instructions to the intake officers, as they testified they had done, and thus they knew that Sandusky would not receive the medical care he required. Plaintiff also avers that because Officer Dittberner should have filled out a detainee medical care referral form, as the intake form states, but did not, he is responsible for the failure to take Sandusky back to the hospital the next day to have his wounds cleaned and bandage changed. As discussed above, the discharge instructions are not a sufficient basis from which to infer that a particular officer knew of the severity of Sandusky's medical needs. And any alleged shortcomings on the part of the officers regarding the paperwork do not amount

---

[6] While Plaintiff's expert has opined that Sandusky's symptoms began 24 hours prior to the time he was found unresponsive, the Court finds that the record as a whole suggests that Sandusky's symptoms were not obvious until closer to the time he was found unresponsive—during the afternoon and evening of June 27.

12

to deliberate indifference. *See Garretson*, 407 F.3d at 797. Because Officers Ross, Zarosly, and Dittberner did not personally interact with Sandusky during the time period he was allegedly exhibiting symptoms, they are entitled to summary judgment.

Sergeant O'Keefe was also working when Sandusky was booked in the prison. He returned the next day and worked a shift on June 26. This was the time period Plaintiff avers Sandusky should have been transported to the hospital consistent with Dr. Albers' discharge notes to have his wounds cleaned and a new dressing applied. Officer Trzos worked the 12 am to 8 am shift the night before Sandusky died. As discussed above, the discharge notes are not a sufficient basis from which to infer a particular officer knew of the severity of Sandusky's medical needs. Because Officers O'Keefe and Trzos did not interact with Sandusky during the time period he was allegedly exhibiting symptoms, they are entitled to summary judgment.[7]

On June 27, 2013, Officers Burks-Weathers and Ewing worked in the cell block where Sandusky was detained from 7 am to 7 pm. Officers O'Brien, Cooper (Robinson), and Small worked that day from 7 pm to 7 am and were present when Sandusky was found unresponsive in his cell at 10:30 pm. While some of the officers recorded more cell checks than others during their shifts, there is testimony in the record that each officer conducted his or her own checks every thirty minutes. (*See* dkt. 109-23, PgID 2373.) As noted above, Officer O'Brien was informed when he came in

---

[7] Plaintiff also brought supervisory liability claims against Officers O'Keefe and Trzos. Due to the Court's conclusion that these officers did not interact with Sandusky during the time period his symptoms were allegedly obvious and the lack of any evidence they "encouraged or condoned" the alleged unconstitutional actions of the officers who did interact with him during that time period, they are entitled to summary judgment on these claims as well. *See Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999).

for his shift that Sandusky may be taken to the hospital. While he testified that it was the responsibility of his supervisor, Sergeant Newkirk, to arrange for the transportation to the hospital, because Officers Burks-Weathers, Ewing, Cooper (Robinson), Small and O'Brien were present during the time Sandusky was allegedly exhibiting symptoms, there is a genuine issue of material fact as to whether they were deliberately indifferent to Sandusky's serious medical needs. Because "a pretrial detainee's right to medical treatment for a serious medical need has been established since at least 1987," *Est. of Carter*, 408 F.3d at 313, these officers are not entitled to qualified immunity and Plaintiff's deliberate indifference claims against them survive summary judgment.

### 2. Gross Negligence Claims

Defendant Officers argue they are immune from the gross negligence claim asserted against them by Plaintiff because they were governmental employees acting within the scope of their employment. Michigan law sets forth that governmental employees are immune from tort liability unless their conduct amounts to "gross negligence that is the proximate cause of the injury or damage." Mich. Comp. Laws § 691.1407(2). Gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." § 691.1407(8)(a).

As the Court found above, there is a genuine issue of material fact as to whether Defendant Officers Burks-Weathers, Ewing, Cooper (Robinson), Small, and O'Brien were deliberately indifferent to Sandusky's serious medical needs. Thus, these officers are not entitled to the protection of the governmental immunity statute. *See Garretson*, 407 F.3d at 801. There is no evidence, however, that the remaining officers were aware of Sandusky's serious medical needs, and, thus, the Court finds them immune from

14

Plaintiff's gross negligence claim. *See id.* And while Defendant Officers argue that any negligence on their part was not the proximate cause of Sandusky's death, in light of the expert testimony in the record that had Sandusky received medical attention several hours prior to being found unresponsive he would have been more likely to survive, (*see* dkt. 109-22, PgID 2367), there is a question of fact as to whether any negligence on the part of the officers was "the one most immediate, efficient, and direct cause of [his] injury." *See Ray v. Swager*, 903 N.W.2d 366, 372 (Mich. 2017) (internal quotations and citation omitted). Thus, Plaintiff's gross negligence claims survive against the same officers his deliberate indifference claims survive.

### B. Defendant Dr. Albers

Defendant Dr. Albers argues she was not acting under color of state law when providing medical care to Sandusky and thus cannot be held liable under § 1983. Alternatively, Dr. Albers argues that Plaintiff's allegations do not rise to the level of a deliberate indifference claim.

To establish a claim under § 1983, Plaintiff must prove the deprivation of a right secured by the Constitution or laws of the United States committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). In order for a private party's conduct to constitute action under color of state law, it "must be fairly attributable to the state." *Collyer v. Darling*, 98 F.3d 211, 232 (6th Cir. 1996) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). To determine whether the conduct at issue is fairly attributable to the state, the Sixth Circuit has recognized three tests: 1) the public function test, 2) the state compulsion test, and 3) the symbiotic relationship or nexus test. *Id.* at 232 (citing *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992)).

"The public function test 'requires that the private entity exercise powers which are traditionally exclusively reserved to the state.'" *Id.* at 232 (quoting *Wolotsky*, 960 F.2d at 1335). Under the state compulsion test, if the "'state exercise[s] such coercive power or provide[s] such significant encouragement, either overt or covert, . . . the choice of the private actor is deemed to be that of the state.'" *Id.* "Finally, under the symbiotic relationship test, 'the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself.'" *Id.*

In *West*, 487 U.S. at 54, the Supreme Court applied principles from the public-function and nexus tests to hold that a private physician who had a long-term contract with the state to provide medical services to inmates at a state prison hospital acted under color of state law. The defendant physician in that case was paid $52,000 annually to operate two clinics each week at a prison hospital. *Id.* at 44. In addition, the doctor was required to adhere to a manual governing prison healthcare in the state, which described the provision of healthcare as a joint effort between correctional administrators and healthcare providers achieved through "mutual trust and cooperation." *Id.* at 51. The court reasoned that "[c]ontracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in custody." *Id.* at 56.

Here, Dr. Albers did not contract with the state as did the physician in *West*. Nor did she provide medical services at a state prison hospital. Many courts have been reluctant to extend the holding of *West* to apply to cases in which a private physician treats a prisoner or inmate off-site and not pursuant to a contract with the state. *See*

*Estate of Rice v. Corr. Med. Servs.*, No. 3:06-CV-697, 2009 U.S. Dist. LEXIS 52149, at *50 (N.D. Ind. June 17, 2009). *But see Conner v. Donnelly*, 42 F.3d 220, 225-26 (4th Cir. 1994).

Plaintiff argues that the contractual relationship between Dr. Albers' employer, the Detroit Receiving Hospital, and Wayne County was sufficient to render Dr. Albers a state actor. (*See* dkt. 107-7.) The DPD, however, was not a party to the agreement and there is nothing in the record to suggest that Sandusky was taken to the hospital pursuant to this agreement. Moreover, the agreement was regarding the compensation owed to the hospital for any medical services provided to county inmates, not a contract to provide medical services to those inmates. (*See id.*) Courts have drawn a distinction between a private company that performs a public function, such as contracting with the state to provide all medical care to prisoners, and a private hospital that receives some public funding and treats a prisoner at the state's request and expense. *See, e.g.*, *Ford v. Kennerly*, No. 1:16-cv-243, 2016 U.S. Dist. LEXIS 70335, at *27-28 (W.D. Mich. May 31, 2016) (finding the actions of the former and its employees fairly attributable to the state but the actions of the latter and its employees not state action); *see also Lefler v. Unknown Party*, No. 1:10-cv-800, 2010 U.S. Dist. LEXIS 97901, at *15-16 (W.D. Mich. Sept. 17, 2010) (holding the fact that a private hospital received public funding and treated the plaintiff at the state's request and expense did not render it a state actor); *Ketola v. Clearwater*, No. 1:08-cv-31, 2008 U.S. Dist. LEXIS 104205, at *8 (W.D. Mich. Oct. 31, 2008) (holding the same). Also, the agreement did not indicate that the state and Dr. Albers acknowledged they had a shared goal as in *West*. *See Collyer*, 98 F.3d at 232-33 (finding that two doctors who contracted with the state to examine a state

employee were not state actors "[g]iven the private status of both doctors, the absence of a contract indicating the need for a collaborative effort between the doctors and the state, and given the independence with which [they] completed their tasks"). In sum, the Court finds that Dr. Albers was not acting under color of state law when she provided Sandusky emergency medical treatment.

And even if the Court were to find that Dr. Albers was a state actor, Plaintiff cannot show there is a genuine dispute over whether Defendant Dr. Albers acted, or failed to act, with "deliberate indifference to [Sandusky's] serious medical needs." *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994). A constitutional violation based on deliberate indifference exists only if the medical treatment provided was "'so woefully inadequate as to amount to no treatment at all.'" *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)). Thus, there is a distinction "'between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment.'" *Id.*

Plaintiff argues that Dr. Albers' actions fell below the applicable standard of care, under which she was required to remove the foreign body after imaging revealed its presence, order and prescribe antibiotics, and arrange for follow-up evaluation of the patient the following day, which she did not do. This, however, amounts to an allegation of negligence. Deliberate indifference requires more than negligence; "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Plaintiff also appears to argue that Dr. Albers should have known that her failure to remove any dirt that was in Sandusky's arm and prescribe antibiotics would result in a risk of infection. However, "it is relevant neither what prison officials 'should have known,' nor whether their conduct comported with the medical standard of care. What is relevant is what they *actually knew*."[8] *Warren v. Prison Health Servs.*, 576 F. App'x 545, 560 (6th Cir. 2014) (unpublished) (quoting *Farmer*, 511 U.S. at 836)). Here, there is no evidence that Dr. Albers knew there was a substantial risk of infection and then disregarded that risk. In sum, "'[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'" *Jennings v. Al-Dabagh*, 97 F. App'x 548, 550 (6th Cir. 2004) (unpublished) (quoting *Westlake*, 537 F.2d at 860 n.5). Because the evidence establishes that Sandusky received some medical attention from Defendant Dr. Albers, the Court finds that any dispute over what else she should have done does not rise to the level of a § 1983 claim. Thus, even if Dr. Albers was a state actor and her actions fell below the applicable standard of care, as Plaintiff alleges, she is entitled to summary judgment.

---

[8] Plaintiff cites to the case of *Weeks v. Chaboudy*, 984 F.2d 185 (6th Cir. 1993), in support of his assertion that the lack of actual knowledge is not a defense if the defendant should have known that her actions would deprive a prisoner of his constitutional rights. However, in that case, the issue was whether the defendant knew that the prisoner, a paraplegic, was unable to clean himself or move about his cell without a wheelchair. *See id.* at 187. Thus, the dispute over what the defendant knew went towards the seriousness of the prisoner's medical needs, rather than the defendant's indifference to those needs.

## IV. Conclusion

For the reasons set forth above, the Court hereby DENIES Defendant Officers' motion for summary judgment with regard to Defendant Officers Burks-Weathers, Ewing, Cooper (Robinson), Small, and O'Brien and GRANTS it with regard to Defendant Officers O'Keefe, Ross, Zarosly, Dittberner, and Trzos. (Dkt. 102.) The Court also GRANTS Defendant Dr. Albers' motion for summary judgment. (Dkt. 104.)

SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: August 8, 2019


I hereby certify that a copy of the foregoing document was served upon counsel of record on August 8, 2019, by electronic and/or ordinary mail.

s/Lisa Bartlett
Case Manager